1

2

3

4

5

6

7

8           UNITED STATES DISTRICT COURT

9           EASTERN DISTRICT OF CALIFORNIA

10

11   BEST BUY STORES, L.P.,                    No.  2:13-cv-00433-MCE-AC

12                 Plaintiff,

13          v.                                 **MEMORANDUM AND ORDER**

14   LF2 ROCK CREEK LP,

15                 Defendant.

16

17          On March 5, 2013, Plaintiff Best Buy Stores, L.P. ("Plaintiff") initiated this action

18   as a result of a dispute with its former landlord, Defendant LF2 Rock Creek LP

19   ("Defendant"), concerning the interpretation of the termination provisions of the parties'

20   lease.  ECF No. 1.  Specifically, the parties dispute Plaintiff's right to  review, audit, and

21   verify the cost of Defendant's (and its predecessors') work on the premises, and the

22   amount owed by Plaintiff to Defendant, if anything.  The parties filed cross-motions for

23   summary judgment which are currently pending before the Court, as is Plaintiff's Motion

24   to Strike.  For the following reasons, Defendant's Motion for Summary Judgment is

25   DENIED, Plaintiff's Cross-Motion for Partial Summary Judgment is DENIED in part and

26   GRANTED in part and Plaintiff's Motion to Strike is DENIED without prejudice.[1]

27   _____

28          [1] Because oral argument would not be of material assistance, the Court ordered this matter
     submitted on the briefs.  E.D. Cal. Local R. 230(g).  See ECF No. 35.

1

**BACKGROUND**

This matter arises out of a dispute between Plaintiff and Defendant concerning the interpretation of the termination provisions of the parties' lease, and it involves a determination of Plaintiff's right to review, audit, and verify the cost of Defendant's (and its predecessors') work on the premises and the amount owed by Plaintiff to Defendant, if anything. ECF No. 7 at 5. Although the parties contested whether, as alleged in the complaint, the lease had been terminated, they now agree that termination in fact occurred. Id.

On or about October 16, 2007, Plaintiff, as tenant, and Intervest Properties LLC, as landlord, negotiated a lease (the "Lease") for Plaintiff's tenancy in the Rock Creek Plaza Shopping Center in Auburn, California (the "Property"). Pl.'s Response, ECF No. 19-1, ¶ 1.[2] The Lease set forth plans for construction and improvements and the obligations of both the landlord and the tenant. See Def.'s Response, ECF No. 22 ¶ 1[3]; see generally ECF No. 18 (the "Lease"). In the parties' Lease, the Landlord agreed, "at its sole cost and expense," to substantially complete the construction of the "Premises"[4] and "Common Areas." Def.'s Response, ECF No. 22 ¶ 1.[5] As is often the case in long-term commercial leases, such as the one at issue between Plaintiff and Intervest, the Landlord expects to recoup these costs over the term of the lease from the rent it charges. Only if Plaintiff exercised its right to terminate the Lease within the first ten years would Plaintiff be responsible for any portion of the cost of Landlord's work in

---

[2] Plaintiff's Response to Defendant's Statement of Undisputed Facts (ECF No. 19-1) will be abbreviated as "Pl.'s Response, ECF No. 19-1."

[3] Defendant's Response to Plaintiff's Statement of Disputed Facts and Additional Facts (ECF No. 22) will be abbreviated as "Def.'s Response, ECF No. 22."

[4] The parties' Lease defines the Premises in detail on pages 2-3 and in the Lease exhibits. See ECF No. 18 at 7-8.

[5] On numerous occasions, without disputing specific facts, Defendant states as follows: "Objection as the Lease speaks for itself. Subject to and without waiving the foregoing objection, Undisputed. [Doc. 18]." See, e.g., Def.'s Response, ECF No. 22 at 2. Because the Court is in receipt of the parties' Lease, which was submitted under Seal (ECF No. 18), these objections are DENIED as moot.

1  addition to its obligation to pay "fixed rent" and "additional rent" as those terms are

2  defined in the Lease.  Id. ¶ 3; see generally ECF No. 18.  In pertinent part, the Lease

3  provides:

4          I. FUNDAMENTAL LEASE TERMS . . . .

5          3. LEASE TERM.

6          The initial term of this Lease shall be for a period of ten (10)
   "Lease Years," as that term is hereinafter defined. … The
7          Lease Term shall expire on the last day of the tenth (10th)
   consecutive "Lease Year," unless sooner terminated or
8          extended as provided herein. . . .

9          Notwithstanding anything in this Lease to the contrary,
   Tenant shall have the right to terminate this Lease, and the
10         Lease Term and all obligations of the parties thereafter
   arising, at the expiration of the fifth (5th) Lease year, upon not
11         less than twelve (12) months prior written notice to Landlord.
   In the event Tenant exercises its right to terminate this Lease,
12         Tenant shall pay to Landlord an amount equal to Landlord's
   unamortized costs for (i) Landlord's Work within or on the
13         exterior of the Premises and (ii) the commission paid under
   Article 35 hereof, amortized based upon a ten (10) year
14         amortization period. Landlord agrees to provide Tenant with a
   detailed breakdown of its costs, and evidence of payment of,
15         Landlord's work and such commission, within three (3)
   months after the Commencement Date, and Tenant shall
16         have the right to review, audit and verify such costs and
   expenses.
17

18 ECF No. 18 at 8-9.

19      As will be discussed more fully below, although the Lease required that Landlord

20 provide Tenant with "a detailed breakdown of its costs, and evidence of payment of,

21 Landlord's work and such commission, within three (3) months after the Commencement

22 Date," the Lease was silent as to the timing of Tenant's "right to review, audit and verify

23 such costs and expenses."  Id.  The Lease also contained a provision stating, in part,

24 that "[i]n the event Tenant pays all or any portion of the Broker's Fees, Landlord agrees

25 that Tenant shall have the right to offset against fixed rent and other amounts payable

26 under this Lease for the total amount of the Brokers Fees paid by Tenant plus interest

27 accruing thereon at the Interest Rate as defined herein until the Broker's Fees and

28 interest are paid in full."  ECF No. 18 at 46 (Article 35).  Through the instant action,

Plaintiff seeks to exercise its rights under Article 3 of the parties' Lease to "review, audit and verify [the] costs and expenses" claimed by Landlord for (i) Landlord's Work within or on the exterior of the Premises and (ii) the commission paid under Article 35 of the Lease.

In March 2008, Intervest assigned the lease to Auburn Plaza Co., Ltd. ("Auburn Plaza"). Pl.'s Response, ECF No. 19-1, ¶ 2. Construction of the Premises was thereafter completed and Best Buy's Lease commenced on August 15, 2008. ECF No. 19 at 10; see Def.'s Response, ECF No. 22 ¶ 4. Auburn Plaza later sold the Premises to Defendant. However, prior to the close of that sale, Plaintiff executed two estoppel certificates in January 2010 and March 2011. Def.'s Response, ECF No. 22 ¶ 4; see ECF Nos. 15-6 (Exhibit F) (January 13, 2010 estoppel certificate); 15-7 (Exhibit G) (March 25, 2011, estoppel certificate). The estoppel certificates signed by Plaintiff stated, in relevant part, as follows:

> 4. The Commencement Date of the term of the Lease is August 15, 2008, and the expiration of the current term of the Lease is January 31, 2019, unless sooner terminated pursuant to the provisions of the Lease.
>
> . . .
>
> 7. Tenant claims no offsets, setoffs, rebates, concessions, abatements, "free" rent or defenses against or with respect to any fixed or additional rent payable under the terms of the Lease but reserves any and all rights and/or remedies Tenant may have to do so as provided for by the Lease, including but not limited to Tenant's right to audit Landlord's books and records pertaining to Landlord's Operating Costs and reimbursable portions of insurance and real estate taxes.
>
> 8. To Tenant's actual knowledge, Landlord is not in default in the performance or observance of any of its obligations under the Lease beyond any applicable notice and cure periods. To Tenant's actual knowledge, Tenant is not in default in the performance or observance of any of its obligations under the Lease beyond any applicable notice and cure periods.

Def.'s Response, ECF No. 22 ¶ 4; ECF Nos. 15-6 at 2-3; 15-6 at 2-3. The Lease defined the terms "fixed rent" and "additional rent." Pursuant to the terms of the parties' Lease, "Fixed rent" is the monthly rent that the tenant pays, while "Additional rent" is the tenant's

4

proportionate share of operating expenses such as common area maintenance.  ECF
No. 18 at 6, 37-39; see Def.'s Response, ECF No. 22 ¶¶ 6, 15; see also ECF No. 19
at 11 (explaining that  Defendant admitted that the Termination Payment was not "fixed
rent" or "additional rent") (citing Defendant's Response to Request for Admission No. 6).
As discussed below, the parties dispute whether paragraphs 7 and 8 of the estoppel
certificates, when read in conjunction with the Lease, waived Plaintiff's rights in a
manner so as to estop Plaintiff from bringing the instant action.  The parties also dispute
whether Plaintiff so unreasonably delayed in making its audit request that it waived any
right to commence the instant action.

On or about January 13, 2013, Plaintiff sent a notice of termination of the Lease
("Notice") effective January 31, 2014.  Pl.'s Response, ECF No. 19-1, ¶ 12.  The parties
disagree as to whether that Notice was effective given that the Notice was not
accompanied by a Termination Payment.  See Def.'s Response, ECF No. 22 ¶ 9.  Along
with a Dispute Notice under Article 16.3 of the Lease, on or about March 5, 2013,
Plaintiff paid Defendant the sum of $1,189,638.79 under protest as the amount
demanded by Defendant as a Termination Payment under Article 3 of the Lease. Id.
¶ 10.  As discussed below, the parties dispute not only the amount of the Termination
Payment, but whether the Termination Payment was due at the time of the Notice or at
the time the lease was terminated.[6]

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the
movant shows that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.
///

---

[6]  As indicated above, although initially a contested point within Plaintiff's March 5, 2013,
Complaint (ECF No. 1), the parties now agree that the Lease has terminated.  See Joint Status Report,
ECF No. 7 at 5.

1    Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

2    dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

3         Rule 56 also allows a court to grant summary judgment on part of a claim or

4    defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may

5    move for summary judgment, identifying each claim or defense—or the part of each

6    claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.

7    Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

8    motion for partial summary judgment is the same as that which applies to a motion for

9    summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

10   Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

11   judgment standard to motion for summary adjudication).

12        In a summary judgment motion, the moving party always bears the initial

13   responsibility of informing the court of the basis for the motion and identifying the

14   portions in the record "which it believes demonstrate the absence of a genuine issue of

15   material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial

16   responsibility, the burden then shifts to the opposing party to establish that a genuine

17   issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith

18   Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

19   253, 288-89 (1968).

20        In attempting to establish the existence or non-existence of a genuine factual

21   dispute, the party must support its assertion by "citing to particular parts of materials in

22   the record, including depositions, documents, electronically stored information,

23   affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

24   not establish the absence or presence of a genuine dispute, or that an adverse party

25   cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

26   opposing party must demonstrate that the fact in contention is material, i.e., a fact that

27   might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,

28   Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also

demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,

477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

before the evidence is left to the jury of "not whether there is literally no evidence, but

whether there is any upon which a jury could properly proceed to find a verdict for the

party producing it, upon whom the onus of proof is imposed."  Id. at 251 (quoting

Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).  As the

Supreme Court explained, "[w]hen the moving party has carried its burden under Rule

[56(a)], its opponent must do more than simply show that there is some metaphysical

doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore, "[w]here the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving

party, there is no 'genuine issue for trial.'"  Id. 87.

        In resolving a summary judgment motion, the evidence of the opposing party is to

be believed, and all reasonable inferences that may be drawn from the facts placed

before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

obligation to produce a factual predicate from which the inference may be drawn.

Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

810 F.2d 898 (9th Cir. 1987).


**ANALYSIS**


        In its Motion for Summary Judgment, Defendant argues first that Plaintiff signed

two valid and enforceable estoppel certificates that preclude its instant action.  Next,

Defendant argues that, even if Plaintiff is not estopped from proceeding, because

Plaintiff was required to exercise its right to audit within a reasonable amount of time and

Plaintiff was provided with sufficient information to make the determination of whether or

1   not to request an audit within a reasonable time, Plaintiff is nonetheless barred from

2   prevailing given that it waited an unreasonably long time (four years) to request an audit.

3   In its Cross-Motion for Summary Judgment, Plaintiff argues that the two estoppel

4   certificates actually reserved its right to review, audit and verify the costs and expenses

5   of Landlord's Work on either the interior or exterior of the Plaintiff's Premises and the

6   realtor's commission.  Plaintiff also argues that it exercised its right to audit within a

7   reasonable amount of time, the Termination Payment was not greater than $992,918.60,

8   and that the Termination Payment was due at the end of the lease, not when it gave

9   notice.  The Court will address each issue in turn.

10      **A.  The Estoppel Certificates Do Not Bar Plaintiff's Action**

11      An Estoppel Certificate, like those signed by Plaintiff, is "a signed certification of

12   various matters with respect to a lease.  An estoppel certificate binds the signatory to the

13   statement made and estops that party from claiming to the contrary at a later time."

14   Plaza Freeway Ltd. Partnership v. First Mountain Bank, 81 Cal. App. 4th 616, 626.

15   (2000).  "By their very nature, estoppel certificates look to the course of performance

16   [and] the signer is certifying the course of performance has not produced any defaults."

17   K's Merchandise Mart, Inc. v. Northgate Limited Partnership, 835 N.E.2d 965, 972 (Ill.

18   App. 2005).  As Defendant notes, prospective purchasers rely upon such certificates to

19   ensure that they will not be exposed to a future claim based upon a course of

20   performance that existed prior to the purchase.[7]

21      Here, the starting point in the Court's analysis is whether the January 13, 2010,

22   and March 25, 2011, estoppel certificates signed by Plaintiff preclude its present

23   demand for declaratory relief on its right to audit, as set forth in its Complaint.  Defendant

24   asserts that because it was entitled to rely on Plaintiff's representations in the two

25   certificates at issue, which Defendant claims set forth that Plaintiff had no outstanding

26   _____

27      [7]  "Black's Law Dictionary defines 'estoppel certificate' as '[a] signed statement by a party, such as
a tenant or a mortgagee, certifying for the benefit of another party that a certain statement of facts is
correct as of the date of the statement, such as that a lease exists, that there are no defaults and that rent
28   is paid to a certain date.'"  Plaza Freeway Ltd. P'ship v. First Mountain Bank, 81 Cal. App. 4th 616, 626
(2000).

1   claims with respect to the lease, Plaintiff cannot prevail.  The relevant facts, as set forth

2   by Defendant, are as follows:

3   
> [I]n January 2010, the prior landlord sold the property to
> [Defendant].  As part of the sale, [Plaintiff] provided the prior
4   > landlord with an estoppel certificate, indicating that [Plaintiff]
> "claims no offsets, set-offs, rebates, concessions,
5   > abatements, 'free' rent or defenses" against the landlord. As
> a pre-condition to its purchase of the property, [Defendant]
6   > <u>required</u> the estoppel from [Plaintiff].  [Plaintiff] was aware
> that [Defendant] was relying on the estoppel in purchasing
7   > the property.  [Defendant] <u>reasonably relied</u> on the
> representations contained in the First Estoppel Certificate
8   > and proceeded with the purchase of the Property. Just over a
> year later, in March 2011, in connection with a loan
9   > agreement between Wells Fargo Bank and [Defendant],
> [Plaintiff] signed a second estoppel certificate containing
10  > identical language to that of the first estoppel certificate,
> representing once again that it had no claims or defenses
11  > related to its Lease with the landlord.

12  Mot., ECF No. 13 at 4 (emphasis in original).  According to Defendant, because Plaintiff

13  did not elect "to audit the expenses at the time they were provided in 2009 or any

14  subsequent time, and because its ability to challenge these expenses had certainly

15  expired by signing the estoppel certificates it had signed denying any claims against the

16  landlord in 2010 and 2011," Plaintiff may not bring its instant claims.  <u>Id.</u> at 5.  In

17  Opposition, Plaintiff asserts exactly the opposite.  In fact, it is Plaintiff's position that

18  rather than waive its rights, "the express language of the certificates demonstrates that

19  [Plaintiff] waived nothing and [instead, in fact] preserved all of [its] rights under the

20  Lease."  Opp'n, ECF No. 19 at 19.  The Court must therefore begin its analysis by

21  examining the language of the estoppel certificates at issue.

22       The January 13, 2010, estoppel certificate states, in relevant parts:

23  
> 4. The Commencement Date of the term of the Lease is
> August 15, 2008, and the expiration of the current term of the
24  > Lease is January 31, 2019, unless sooner terminated
> pursuant to the provisions of the Lease.
25  

26  > …

27  > 7. Tenant claims no offsets, set-offs, rebates, concessions,
> abatements, "free" rent or defenses against or with respect to
> any fixed or additional rent payable under the terms of the
28  > Lease but reserves any and all rights and/or remedies Tenant

may have to do so as provided for by the Lease, including but not limited to Tenant's right to audit Landlord's books and records pertaining to Landlord's Operating Costs and reimbursable portions of insurance and real estate taxes.

8. To Tenant's actual knowledge, Landlord is not in default in the performance or observance of any of its obligations under the Lease, beyond any applicable notice and cure periods. To Tenant's actual knowledge, Tenant is not in default in the performance or observance of any of its obligations under the Lease beyond any applicable notice and cure periods.

Def.'s Response, ECF No. 22 ¶ 4; ECF Nos. 15-6 at 2-3; 15-6 at 2-3.  In support of its argument, Defendant repeatedly selectively cites portions of the above passage, namely portions of paragraph 7.  See Mot., ECF No. 13 at 4 (arguing that Plaintiff "provided to the prior landlord with an estoppel certificate, indicating that [Plaintiff] 'claims no offsets, set-offs, rebates, concessions, abatements, 'free' rent or defenses' against the landlord"); id. at 7 (same); id. at 10 (same).  However, as Plaintiff points out, "when the certificates . . . are read in their entirety, [Defendant's] interpretation" is incomplete.  Opp'n, ECF No. 19 at 20.  As set forth above, in paragraph 7, Plaintiff expressly warranted that "it claim[ed] no offsets, set-offs, rebates, concessions, abatements, 'free' rent or defenses against or with respect to any fixed or additional rent" payable under the terms of the Lease."  ECF No. 15-6 at 2-3 (emphasis added).[8]  At the same time, Plaintiff clearly reserved its right "to audit Landlord's books and records pertaining to Landlord's Operating Costs and reimbursable portions of insurance and real estate taxes."  Id.  Finally, and most importantly, there was no express waiver within paragraph 7 of Plaintiff's right under Article 3 of the parties' Lease to "review, audit and verify [the] costs and expenses" claimed by Landlord for the Landlord's Work within or on the exterior of the Premises and the commission paid under Article 35 of the Lease.[9]  See generally

_____

[8] As set forth above, "Fixed rent" is the monthly rent that the tenant pays, while "Additional rent" is the tenant's proportionate share of operating expenses such as common area maintenance.  ECF No. 18 at 6, 37-39; see Def.'s Response, ECF No. 22 ¶¶ 6, 15; see also ECF No. 19 at 11 (explaining that Defendant admitted that the Termination Payment was not "fixed rent" or "additional rent") (citing Defendant's Response to Request for Admission No. 6).

[9] As Plaintiff notes, "[a]t a minimum, the estoppel certificate says nothing about a waiver of a right to review, audit and verify the records and payments underlying a conditional future obligation to make a Termination Payment in some undetermined amount."  Opp'n, ECF No. 19 at 11.

1  ECF Nos. 15-6, 15-7.  Thus, when read in conjunction with the parties' Lease, paragraph

2  7 warrants only that Plaintiff "claim[ed] no offsets, set-offs, rebates, concessions,

3  abatements, 'free' rent or defenses against or with respect to any <u>fixed or additional rent</u>

4  payable under the terms of the Lease."  ECF No. 15-6 at 2-3 (emphasis added).[10]

5  Therefore, because the Termination Payment was not defined as either fixed or

6  additional rent, under the terms of the estoppel certificates, Plaintiff did not relinquish its

7  right to "review, audit and verify [the] costs and expenses" claimed by Landlord for the

8  Landlord's Work within or on the exterior of the Premises and the commission paid under

9  Article 35 of the Lease in paragraph 7.

10      In its Reply to Plaintiff's Opposition and in Opposition to Plaintiff's Cross-Motion,

11  Defendant contends that it relied not just on paragraph 7 where Plaintiff claimed no

12  "offsets" or "set-offs" as set forth above, but that it also relied on paragraph 8 where

13  Plaintiff warranted that the "Landlord is not in default in the performance or observance

14  of any of its obligations under the Lease."  ECF No. 21 at 3-4.  However, as Plaintiff

15  notes,

16       [i]n the language of the Lease's Article 16.3, there is no
        evidence of any default in the Landlord's performance of any
        monetary or non-monetary obligation from the time that it
17      cured its failure to provide a breakdown of the Landlord's
        Work (in 2009) until the time it refused to allow Best Buy to
18      review, audit and verify the costs of the Landlord's Work (in
        2013). Without any showing of a default, and Defendant has
19      made none, there was nothing to waive [at the time of the
        signing of the estoppel certificates with respect to Plaintiff's
20      right to audit].

21  ECF No. 27 at 7-8.[11]  Moreover, as Plaintiff points out, Defendant's own Statement of

22  Undisputed Facts states as fact that "[i]n response to [Plaintiff's] termination notice, on or

23  _____

24  [10]   Although Defendant may have assumed that the estoppel certificate expressly covered the
    claims at issue in this action, it did so incorrectly and unreasonably under the circumstances and in light of
    the language of the estoppel certificates and the Lease.

25  [11]   On or about February 19, 2009, Best Buy sent Auburn Plaza a notice of default associated with
    Auburn Plaza's failure to provide Best Buy within three months after the Commencement Date a detailed
26  breakdown of costs and evidence of payment of both Landlord's Work and the broker's commission.  Pl.'s
    Response, ECF No. 19-1 ¶ 3.  On March 17, 2009, in response to Best Buy's letter, Auburn Plaza sent a
27  packet containing "Landlord's detailed breakdown of costs, and evidence of payment, of broker
    commissions and Landlord's Work with regard to the referenced Premises." Id. ¶ 4.  The parties dispute
28  whether the information provided to Plaintiff was adequate.  <u>See Id.</u> ¶ 5

about February 5, [2013], [Defendant] sent [Plaintiff] notice that its termination notice has <u>triggered the obligation</u> to pay the unamortized costs for Landlord's Work related to the construction and also commission costs as set forth in Article 3 of the Lease."  ECF No. 27 at 4-5 (citing Def.'s Statement of Undisputed Facts, ECF No. 14 ¶ 13) (emphasis added by Plaintiff).  Accordingly, "[t]here was no obligation and no dispute that predated the signature of the estoppel certificates with respect to the Termination Payment."  <u>Id.</u> at 5.  Therefore, because Plaintiff "did not . . . decide to terminate the Lease until well after the estoppel certificates were signed," Plaintiff did not waive its right to audit the expenses in the estoppel certificates.  <u>Id.</u>  The Court finds that Plaintiff has the better argument on this point.

When paragraphs 7 and 8 of the estoppel certificate are read together in conjunction with the parties' Lease, it is clear that the estoppel certificate did not waive Plaintiff's right to review, audit, and verify [the] costs and expenses at issue.  Moreover, given that at the time the estoppel certificates were signed no Termination Payment had been demanded because no notice of termination had been given, Plaintiff did not waive this right by stating, in paragraph 8 that, at the time of the signing of the estoppel certificates, that the Landlord was not in default in the performance or observance of any of its obligations under the Lease.[12]  Defendant could not have been in breach of its obligation to permit Plaintiff to exercise its right to "review, audit and verify" the costs and expenses at issue at the time of the signing of the estoppel certificates.  Plaintiff is therefore correct that no claim for breach occurred until the Termination Payment was demanded in 2013 and thereafter Defendant refused to allow Plaintiff to review, audit and verify the costs of the Landlord's work.  It follows then, that because Plaintiff had not yet demanded an audit, there was no denial of such request by Defendant which Plaintiff

---

[12]  This conclusion is further buttressed by the fact that the Lease was silent as to the timing of Plaintiff's demand for an audit.  The parties agree that a term of reasonableness is implied, but disagree as to whether Plaintiff's demand is timely.  As set forth below, whether Plaintiff made its audit request within a reasonable period of time is a question for the trier of fact.  Since the Lease provided no time by which the audit demand was required, this further supports the conclusion that Plaintiff did not waive its right when the estoppel notices were signed to review, audit, and verify the costs and expenses that were, in any event, not due unless and until it terminated the lease.

1 could have waived through the estoppel certificates.  While it is clear that Plaintiff is

2 estopped from taking any position contrary to its representation in the estoppel

3 certificates, because the Court finds that Plaintiff did not waive its right to review, audit,

4 and verify the realtors' commission, or the costs and expenses of Landlord's Work, either

5 in the interior or exterior of the Plaintiff's Premises, Defendant's Motion for summary

6 judgment as to the impact of the estoppel certificates is DENIED.[13]  Accordingly, with

7 respect to Plaintiff's Cross Motion for Summary Judgment, the Court finds that Plaintiff

8 did not waive its rights under the Lease with respect to its right under Article 3 to review,

9 audit and verify the costs and expenses claimed by Landlord upon termination of the

10 Lease for (i) Landlord's Work in either the interior or exterior of the Premises and (ii) the

11 commission paid under Article 35.[14]

12
13
### B.  Timeliness of Plaintiff's Invocation of its Right to Review, Audit, and Verify the Costs and Expenses at Issue

14          Next, Defendant argues that Plaintiff's delay in seeking to exercise its audit rights

15 is patently unreasonable and therefore waived its audit rights.  Although the Lease

16 specified that the Landlord was required to provide Plaintiff with a breakdown of the

17 costs within three months of the commencement date, the Lease does not specify a time

18 for Plaintiff to conduct or complete its review, audit, and verification of the records of

19 those costs.  See Def.'s Response, ECF No. 22 ¶ 4.  Thus, the parties agree that a

20 reasonable time for performance is implied under California law. See Cal. Civ. Code

21 § 1657 (explaining that "[i]f no time is specified for the performance of an act required to

22 be performed, a reasonable time is allowed"); see Palmquist v. Palmquist, 212 Cal. App.

23
24          [13] For these same reasons, the Court rejects Defendant's contention that because it relied on the estoppel certificates, Plaintiff is also precluded from raising its claim under the common law doctrine of estoppel.  See Mot., ECF No. 13 at 12-13; Cal. Evid. Code § 623.

25
26
27
28          [14] Plaintiff also moves to strike the Declaration of Morgan Bartz submitted in support of Defendant's reply in support of its motion for summary judgment and in opposition to Plaintiff's cross-motion for partial summary judgment on the ground that the declaration is procedurally improper, lacks foundation and personal knowledge, and states improper legal conclusions and expert opinion.  Plaintiff's Motion to Strike (ECF No. 29) is DENIED without prejudice because Defendant was permitted to rely on new evidence in opposition to Plaintiff's moving papers, and because the Court did not consider that evidence in making the above findings.

1  2d 322, 331 (Ct. App. 1963) (noting that where "the contract was silent as to the time of

2  delivery a reasonable time for performance must be implied").  However, the parties

3  sharply disagree as to whether Plaintiff requested an audit within a reasonable time

4  under the circumstances.

5  　　　　In support of its argument, Defendant argues that because there was no

6  impediment to Plaintiff immediately, "let alone within a reasonable time of a few months

7  [in] demanding an audit, especially as such audit records require the landlord to reach

8  out to third parties to provide such details."  Mot., ECF No. 13 at 13.  Specifically,

9  Defendant explains that "[a]udit records for construction documents necessarily require

10  the landlord to reach out to third parties such as contractors, architects, construction

11  companies, and any number of subcontractors to obtain the requisite level of detail."  Id.

12  Therefore, the crux of Defendant's argument with respect to timing is that it would only

13  be reasonable that any audit rights would be exercised "contemporaneous with the

14  construction expenditures."  Id.  Defendant certainly presents a compelling argument.

15  Indeed, it would make sense that "[i]t is simply not custom and practice in a 'build to suit'

16  to hold on to construction records indefinitely; only so long as it takes for the tenant to

17  review the records and raise any issues."  ECF No. 21 at 6.  Thus, under the

18  circumstances, it may very well be that it was unreasonable for Plaintiff to wait four years

19  after construction to exercise its audit rights.  However, given that, as Plaintiff argues, it

20  did not have an obligation to pay for any portion of these costs "unless and until it

21  terminated the Lease before the end of the first ten years, Plaintiff had no business

22  reason or incentive to expend the time and resources necessary to inspect, review or

23  audit the Landlord's records before such an obligation arose."  Opp'n, ECF No. 19 at 12-

24  13.  Thus, Plaintiff somewhat convincingly notes that "[o]nly after giving notice of

25  termination was there any justification for [Plaintiff] to spend the time and resources to

26  audit and review those costs."  Id. at 13.  Plaintiff goes on to argue that "[t]he custom and

27  practice in the retail commercial leasing industry compels the same conclusion."  Id.

28  (citing the Di Geronimo Declaration ¶ 38).  Plaintiff thus also presents, to some extent, a

14

1  convincing argument in its favor on the issue of the reasonableness of the timing of its

2  audit demand.

3  Under all of the facts presented to the Court, it is not clear that Plaintiff acted so

4  unreasonably in delaying the invocation of its audit rights under the Lease so as to waive

5  its instant action and therefore summary judgment on this question must be denied.

6  Although the Court may find one of the parties' positions to be more compelling, in light

7  of all of the facts, it cannot predict how a reasonable jury might resolve the question.[15]

8  This is especially true given that "[r]easonableness, when related to timeliness, is

9  necessarily a question of fact, and therefore must be resolved according to the

10  circumstances of the particular case." City of Stockton v. Stockton Plaza Corp.,

11  261 Cal. App. 2d 639, 646 (1968); see Pico Citizens Bank v. Tafco Inc., 201 Cal. App.

12  2d 131, 137 (1962) ("What constitutes reasonable time is always a question of fact.").

13  Here, it will be the role of the jury to examine "the situation of the parties, the nature of

14  the transaction, and the facts of the particular case" in making the determination of

15  whether Plaintiff acted reasonably.  Marshall & Co. v. Weisel, 242 Cal. App. 2d 191, 195

16  (1966).  As Defendant notes, it may very well be that Plaintiff's interpretation of a

17  reasonable time to audit makes no business sense, but that determination is one for the

18  trier of fact.  Based on the record before it, for all of these reasons, the Court DENIES

19  ///

20

21  [15] Defendant also notes that because the "prior landlord provided a very reasonable, and very
detailed breakdown of construction and broker commission costs that was sufficient to put [Plaintiff] on

22  notice if any charges appeared to be excessive or inaccurate that would justify an audit." Mot., ECF
No. 13 at 14.  Although Defendant may ultimately prove to have the better argument on this point, for the

23  reason set forth above, this too, is a question of fact for the jury to determine at trial.  Even if, as Defendant
alleges, the landlord provided a very reasonable and detailed breakdown of costs, under these facts, a jury

24  could nonetheless find that it was reasonable for Plaintiff to delay seeking an audit given that at that time it
received the costs, for a variety of reasons, given that it may not have ever paid any of the costs itself.  In

25  any event, Plaintiff disputes Defendant's contention that the information provided by Plaintiff "included
detailed summaries with line item expenses and actual invoices received from the construction company,

26  architect, and brokers involved." See Pl.'s Response, ECF No. 19-1, ¶ 5.  On this point, Plaintiff asserts
that "[a] triable issue of fact exists regarding the adequacy of the detail of the expenses and supporting

27  documentation provided, and the extent to which those bills reflect work done 'within or on the exterior of
the Premises' of the Best Buy store." Id.  This too is a question of fact for the jury in determining whether

28  Plaintiff's delay was unreasonable.

1  Defendant's motion for summary judgment made on grounds that Plaintiff's delay in

2  seeking to exercise its audit rights was patently unreasonable.[16]

3  **C.   Determination of the Amount of the Termination Payment**

4      Through this action, Plaintiff seeks declaratory relief as to the proper amount of

5  the termination payment.  <u>See</u> ECF Nos. 1, 19.  Specifically, Plaintiff contends that

6  "[r]eviewing the amounts billed for Landlord's Work 'within or on the exterior of the

7  [Plaintiff's] Premises' reveals that the amount of the Termination Payment demanded

8  and collected was too high."  Opp'n, ECF No. 19 at 13.  Through its pending cross-

9  motion, Plaintiff requests that the Court enter partial summary judgment to "state that the

10  amount required to be paid by [Plaintiff] upon termination of the Lease was <u>no more than</u>

11  $993,918.60, and that [Plaintiff] is entitled to a refund from Defendant of at least

12  $196,720.19."  <u>Id.</u> at 16-17 (emphasis added).  However, Plaintiff "does not concede this

13  amount was incurred or was reasonable for the Landlord's Work within or on the exterior

14  of the [Plaintiff's] Premises."  <u>Id.</u> at 17 n.6.  In fact, Plaintiff explains that even if the Court

15  were to grant partial summary judgment on this issue alone and find that "no triable issue

16  of fact remains in establishing that $992,918.60 is a ceiling" for the correct total amount

17  of work, "a triable issue of fact remains concerning how much lower the correct total

18  amount of the work is."  <u>Id.</u>

19      The Court declines to find that Plaintiff is entitled to a refund from Defendant of "<u>at</u>

20  <u>least</u> $196,720.19."  <u>Id.</u> at 17 (emphasis added).  Given that, as set forth above,

21  Defendant may prevail in demonstrating that Plaintiff's delayed invocation of its right to

22  audit was unreasonable under the circumstances, Plaintiff may not be entitled to any

23  recovery.  Thus, even assuming, without deciding, that Plaintiff is correct that no triable

24      [16] For these same reasons the Court rejects Defendant's argument that Plaintiff necessarily
25  waived its audit rights and right to challenge the Landlord's costs and broker commissions.  On this point,
    Defendant contends that "[Plaintiff's] claims are barred by waiver as it remained silent for years and did not
26  request an audit when the landlord had the ability to provide the backup details required for an audit."
    Mot., ECF No. 13 at 14.  As set forth above, a jury could find that Plaintiff did not, under the
27  circumstances, unreasonably "remain silent."  Although the Court declines to find for Defendant on this
    point at this stage in the proceedings, Defendant may, of course, present its waiver argument to the jury.
28  Nor does the Court find, as requested by Plaintiff, that the time period in question did not begin to run until
    the time of Plaintiff's notice of termination of the Lease.

1   issue of fact remains in establishing that $992,918.60 is a ceiling for the correct total

2   amount of work, the Court declines to grant summary judgment on this issue.  See

3   Fed. R. Civ. P. 56 advisory committee's note on 2007 amendments (explaining that

4   "there is discretion to deny summary judgment when it appears that there is no genuine

5   issue as to any material fact.").[17]  Here, Plaintiff moves for summary adjudication as to

6   the amount of the termination payment, although it has not established that it is entitled

7   to any refund.  "Piecemeal adjudication of a portion of [Plaintiff's claim] without a fully

8   developed record" and without the benefit of the presentation of evidence at trial, "may

9   complicate rather than simplify the ultimate resolution of the dispute between the

10  parties."  Helios Int'l S.A.R.L. v. Cantamessa USA, Inc., 2014 WL 2119841, at *17

11  (S.D.N.Y. May 21, 2014).  Moreover, granting [Plaintiff's Motion as to the ceiling amount]

12  at this time would not resolve [this action] so as to avoid [further proceedings]."  Id. (citing

13  North Am. Roofing Servs., Inc. v. Nat'l Trust Ins. Co., 2009 WL 5062080 (S.D. Tex.

14  Dec. 16, 2009)).  In fact, as Plaintiff readily admits, even if it is entitled to a refund, and

15  the Court has not found that it is, "a triable issue of fact remains concerning how much

16  lower the correct total amount of the work is."  ECF No. 19 at 17 n.6.  Thus, it would be

17  unwise to enter summary judgment as to the "ceiling" of a refund to which Plaintiff seeks

18  to establish lesser amount at trial and to which the Court has not determined Plaintiff is

19  entitled.  Therefore, Plaintiff's Cross-Motion as to the amount of the termination payment

20  is DENIED.

21        **D.   Timing of the Termination Payment**

22        Finally, the parties dispute whether the Plaintiff's Termination Payment was due at

23  the time it gave notice of its intent to terminate the lease or at the time that the lease was

24  terminated.  Through its Cross-Motion, Plaintiff seeks summary adjudication on the

25  grounds that the lease did not require that the Termination Payment be made until the

26  actual termination of the lease and that Plaintiff was therefore improperly denied the use

27        [17] In any event, Defendant purports to dispute many of the facts underlying Plaintiff's assertion as
     to the requested ceiling amount.  See generally  Def.'s Response, ECF No. 22; see also Pl.'s Response,
28  ECF No. 19-1.

1   of the money it paid under protest for nearly a year.  Plaintiff's argument is well taken.

2             With respect to the Termination of the Lease, the Lease provides, in relevant part,

3   as follows:

4           In the event Tenant exercises its right to terminate the Lease,
    Tenant shall pay to Landlord an amount equal to Landlord's
5   unamortized costs for (i) Landlord's Work within or on the
    exterior of the premises and (ii) the commission paid under
6   Article 35 hereof, amortized based upon a ten (10) year
    amortization period.
7

8   ECF No. 18 at 9.  Notably, the Lease does not indicate when the payment must be paid.

9   However, the Lease, namely Articles 7 and 16.1, define all sums to be paid to the

10  Landlord as "rent."  See ECF No. 18 at 16-17, 24-26.  As Plaintiff points out, under

11  California law, unless otherwise specified, rent is payable at the termination of the period

12  of the Lease.  See Cal. Civ. Code § 1947.  Thus, Plaintiff is correct in that the

13  Termination Payment was due at the end of the lease, not when Plaintiff gave notice.

14  Defendant's argument to the contrary is unavailing and unsupported by the Lease or any

15  other authority.[18]  Because Defendant's demand that the Termination Payment be made

16  at the time the notice of termination was given was improper, regardless of the outcome

17  of the remainder of the issues pending in this case, Plaintiff is entitled to recover interest

18  on the advanced payment from the date of payment, March 5, 2013, through the

19  effective termination date of the Lease, January 31, 2014.[19]

20  ///

21  ///

22  ///

23  ///

24         [18] In pertinent part, Defendant argues that "[i]f the Lease had been intended to allow the payment
    to be made when the tenant vacated the premises, it would have included that language after the word
25  'Lease', i.e., 'In the event Tenant exercises its right to terminate the Lease, upon vacating the premises
    Tenant shall pay to Landlord . . .'"  ECF No. 21 at 9 (emphasis added by Defendant).
26

27         [19] Because the proper amount of the Termination Payment is unknown given the outstanding
    issues in this matter, the Court declines to enter partial judgment as to the amount at this time.  The Court
28  will do so, upon the resolution of this matter at trial or upon a stipulation of the parties should they
    informally resolve this matter in the meantime.

1

**CONCLUSION**

2

3      Given the foregoing, Defendant's Motion for Summary Judgment (ECF No. 12) is

4   DENIED, Plaintiff's Cross-Motion for Summary Judgment (ECF No. 19) is DENIED in

5   part and GRANTED in part as set forth above, and Plaintiff's Motion to Strike (ECF

6   No. 29) is DENIED without prejudice.

7      IT IS SO ORDERED.

8   Dated:  November 5, 2014

9

10

11   _____
    MORRISON C. ENGLAND, JR, CHIEF JUDGE
12   UNITED STATES DISTRICT COURT

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19